AO 106 (Rev. 01/09) Application for a Search Warrant

**FILED**
At Albuquerque NM

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

JUN 2 9 2016

MATTHEW J. DYKMAN
CLERK

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| 2428 Rice Avenue NE, apartment A4, Albuquerque, NM | ) ) ) |

Case No. 16 - MR - 489

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____ District of _____ New Mexico _____ *(identify the person or describe property to be searched and give its location):* 2428 Rice Avenue NE, apartment A4, Albuquerque, NM

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):* Items related to drug rip-offs and drug trafficking (See Attachment B).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of _____21_____ U.S.C. § ___841(a)(1)___ , and the application is based on these facts: See Attached (incorporated by reference herein)

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Russell Johnson, Special Agent ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     06/29/2016

_____
*Judge's signature*

KAREN B. MOLZEN
U.S. MAGISTRATE JUDGE
*Printed name and title*

City and state:  Albuquerque, NM

## AFFIDAVIT FOR SEARCH WARRANT

I, Russell Johnson, being duly sworn, hereby declare and state:

## I.   INTRODUCTION

1.      I am a Special Agent (SA) with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since November 13, 2005.  I am presently assigned to the ATF Oxford Field Office in Oxford, Mississippi, and working on assignment in Albuquerque, New Mexico, and surrounding area.  I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7).  I was trained as an ATF Special Agent at the Federal Law Enforcement Training Center in Glynco, Georgia.

2.      As an ATF Special Agent, I have participated in federal investigations involving the distribution of controlled substances as well as federal firearms violations.  During these investigations, I have participated in various types of investigative techniques, to include electronic surveillance, undercover agents and informants, and controlled purchases of firearms and narcotics from suspects.  I have participated in physical surveillance operations and have participated in the execution of federal arrest and search warrants.  In addition to utilizing the aforementioned investigative techniques, I have been required during these investigations to analyze information resulting from traditional record searches, as well as reviewing previous case files.

3.   This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

1.  On June 25, 2016, ATF Special Agents (SA) debriefed ATF Confidential Informant (CI)
    11438 regarding an individual he/she had met on June 24th who introduced himself as
    "GA." GA informed the CI that he sold marijuana. The CI stated he/she provided his/her
    telephone number to GA. The CI stated HAMMOND was the lone occupant of a white
    van. On June 25, 2016, the CI was at a Circle K gas station located at 900 Eubank
    Boulevard NE, Albuquerque, NM when HAMMOND coincidentally arrived at the
    location. HAMMOND asked the CI if he was "down with doing licks" (in this context, a
    lick is referring to conducting a robbery/drug rip-off). HAMMOND explained to the CI
    that he knows a male individual who has "a lot of cocaine" and money. HAMMOND
    stated the male lives his "girl" and children. HAMMOND told the CI that they would
    "tie the kids up" and the children would be involved because they would have to use any
    means necessary to get the money.

2.  HAMMOND then asked the CI if he/she had the ability to acquire firearms to be used in
    the robbery. HAMMOND stated that he was going to attempt to acquire a firearm from
    his brother. The CI, at ATF's direction, informed HAMMOND that he/she would try to
    acquire a firearm and that he was interested in conducting the robbery. HAMMOND
    instructed the CI to let him know if he was able to acquire a firearm and the two (2)
    departed the location. The CI stated HAMMOND was driving a blue Chevrolet Malibu
    and that there was a Hispanic female in the vehicle with him (HAMMOND).

3.  On this same date, the CI called HAMMOND and asked if "it" (referring to the robbery)
    was going to be "gravy," to which HAMMOND replied that it is going to be gravy and
    that the "motherfucker better act right, I ain't even tripping, that's how I get down bro."
    During this investigation, HAMMOND used a cellular telephone having a call number of
    505 389-0531. The CI asked HAMMOND if the individual had ounces or bricks in the
    residence, referring to quantity of narcotics. HAMMOND replied that the individual
    does not even live in Albuquerque, that he lives in Texas and just "popped up" out of
    nowhere and that he has "got to be on something." The CI confirmed with HAMMOND
    that the individual had children in the residence, to which HAMMOND answered that
    there will be children present; however they would be asleep and that there will be a

babysitter there.  HAMMOND stated that the individual will at "the little bitch house" and that he (HAMMOND) had been over there recently.

4.  HAMMOND told the CI that "it's official my nigga, if you got a banger..." he/she could come with HAMMOND on the robbery or let HAMMOND use it during the robbery and that HAMMOND would "break you off whatever I come out with."  HAMMOND then stated "I'm going."  HAMMOND told the CI "this nigga gotta get got...I don't play that shit...don't fuck with my hoes."  HAMMOND said that the individual has been "salty" with him for a couple years over "hoes."  HAMMOND stated he talked with his "kinfolk" about his plan to rob the individual and they asked why he wanted to do it. HAMMOND said that he did not know what the individual's intentions were and that you never know when somebody is planning to get you and "I'm gonna get them first." HAMMOND said he knows too much and that he was going to make the first move. HAMMOND then instructed the CI to get a hold of something or rent something (referring to acquiring a firearm) and "I'll make it worth your while."  HAMMOND then ended the telephone call by telling the CI that he appreciated the CI helping him.  This telephone call was recorded.

5.  On this same date, utilizing a law enforcement database, ATF SA Russell Johnson identified Adrian HAMMOND (B/M, 12/29/1986, XXX-XX-1285) as possibly being "GA."  SA Johnson acquired a state of New Mexico driver's license photo of HAMMOND and showed it to the CI, who positively identified the individual as "GA."

6.  On this same date, SA Johnson queried HAMMOND'S criminal history via NCIC and observed the following; Burglary, Willful Obstruction of Law Enforcement Officers, Theft by Taking (GA- CONVICTION), Willful Obstruction of Law Enforcement Officers (CONVICTION), Probation Violation, Possession Firearm by a Convicted Felon (CONVICTION), Battery on Household Member, Criminal Damage, Kidnapping, Kidnapping, Possession of Firearm or Destructive Device by a Felon, Battery- Household Member, Kidnapping, Kidnapping, False Imprisonment (CONVICTION), Aggravated Assault (CONVICTION), and Escape from Jail.

7.  On this same date, HAMMOND sent the CI a text message with a picture of what
    appears to be a Glock firearm and stated "I got mine".



8.  On this same date, the CI called and informed HAMMOND that he/she was about to go
    "pick up my shit now," referring to acquiring a firearm and that he/she was ready
    whenever HAMMOND was.  The CI then asked HAMMOND "it's just me and you,
    right?"  HAMMOND confirmed that "it's just me and you."  HAMMOND informed the
    CI that like he had told the CI earlier, he is going to go talk to his brother and "be like
    give me your heat, I'll be back with it."  HAMMOND told the CI that his "other guy is
    bullshitting and I'm like I'm going regardless."  HAMMOND stated he had already
    scoped the scene out.  HAMMOND said he was going to go to his house and get dressed
    and then go downtown.  HAMMOND stated he wanted to "show face like everything is
    gravy, then I'm going to strike out early."

4

9. The CI then asked HAMMOND if he wanted the CI to come to his residence and they could ride together. HAMMOND stated the CI could follow him and come to his residence because "my baby momma gonna come." The CI asked HAMMOND if she was coming to, to which he replied that she was going to ride downtown to make it look good. The CI asked HAMMOND if she was going to go into the club. HAMMOND answered yes and stated he was unsure if he was going to go into the club or that he might just walk around downtown.

10. On this same date, HAMMOND sent the CI a text message which read "If u ready u can follow me down," to which the CI asked HAMMOND where he was. HAMMOND stated he was near the intersection of Texas Avenue and Marquette and that he was about to leave and go to his "bm crib" (referring to baby mother's residence).



11. On this same date, the CI called HAMMOND and informed him that he/she grabbed a
    hoodie and asked HAMMOND if he had something to cover his face.  HAMMOND
    replied "I got one, I ain't got no extras."  HAMMOND informed the CI that they could a
    mask for the CI out of a shirt.  The CI informed HAMMOND that he/she does not want
    them to be able to see my face.  HAMMOND then asked the CI if he/she was going to
    follow him or what.  The CI asked HAMMOND where he wanted him to come.
    HAMMOND then replied that he would text the CI the address (see above text).  This
    telephone call was recorded.

12. On this same date and into the early hours of June 26, 2016, ATF conducted an operation
    in which the CI was outfitted with audio/video recording equipment, along with the CI's
    vehicle.  Prior to the operation commencing, CI's person and vehicle (CIV) were
    searched for contraband with negative results.

13. At approximately 11:55pm, the CI called HAMMOND as he/she was arriving at the
    address HAMMOND previously texted the CI to come to, 2428 Rice Avenue NW,
    Albuquerque, NM.  At approximately 11:56pm, the CI observed HAMMOND in the
    driveway of the apartment complex and made contact with him.  The CI asked
    HAMMOND if "she" was ready, referring to the earlier discussion the CI had with
    HAMMOND in which he stated the mother of his children would be coming with them.
    HAMMOND stated she was ready and directed the CI into their apartment, apartment
    number A4.

14. Once inside the apartment, HAMMOND introduced the CI to his "baby momma"
    "ALICIA," later identified as Alicia COLEMAN (B/F, 8/5/1986, XXX-XX-8095).  There
    was also a young male child in the kitchen with COLEMAN when the CI entered the
    residence.  HAMMOND then directed the CI to a bedroom, where when they entered,
    there was a small female child asleep in the bed.  HAMMOND informed the CI that "we
    gonna go in the club and do normal shit," and stated "you know what's up...you from the
    city, you know how we get down."  HAMMOND stated that the CI would roll with him

6

and HAMMOND would introduce the CI and then "we'll keep it pushing."  HAMMOND told the CI that COLEMAN would go into the club and scout the intended victim of the robbery.

15. HAMMOND told the CI that "I'm hitting the bitch up…them niggas over there." HAMMOND stated they (HAMMOND, COLEMAN, and the CI) would leave the club about 1:45am because the club closes at 2:00am.  If the other individuals decide they want to get something to eat, he and the CI will drop COLEMAN off and then change out vehicles on Texas Avenue because the individual he wishes to rob knows his vehicle. HAMMOND told the CI "I already got the escape route" and that he would show it to the CI after they leave downtown and that everything is "A1."

16. HAMMOND then directed the CI back into the living room where COLEMAN was. HAMMOND and COLEMAN began a discussion and COLEMAN advised that she could not find the "zip ties."  The CI interjected asking "a suitcase," referring to what COLEMAN could not locate.  HAMMOND replied "no, zip ties."  HAMMOND stated he does not have any, but that they can make some stating "tie a mother fucker up with some thongs."  COLEMAN then directed HAMMOND to the kitchen area where some rope was located.  HAMMOND then walked into the kitchen and could be seen carrying a length of rope.  HAMMOND then retrieved a firearm from his pants pocket and handed it to the CI.  The CI recognized the firearm as the one HAMMOND had texted him a picture of earlier in the evening.  HAMMOND referred to the firearm as "compact" and stated he had another one at another location.  HAMMOND stated he likes to carry "XDs" (an XD is a model of firearm manufactured by Springfield Armory). HAMMOND said he likes to carry "40s" and "45s."

17. At approximately 12:06am, the CI showed HAMMOND a pair of latex clothes that he/she retrieved from the CIV.  HAMMOND told the CI that he had a whole bag of those and referred to them as "latex."  HAMMOND stated he acquired the gloves from COLEMAN because she is a nurse.  The CI informed HAMMOND and COLEMAN that

he/she had a hoodie to help conceal his/her appearance and HAMMOND stated he was going to have COLEMAN braid his hair to help disguise his appearance. While inside the apartment, HAMMOND can be observed sitting in a chair and COLEMAN began braiding his hair. According to the CI, HAMMOND placed the rope he was carrying inside a black shirt or sweater.

18. At approximately 12:09am, the CI, HAMMOND, and COLEMAN exited the apartment, leaving the two (2) small children in the home alone. The CI observed HAMMOND place the black shirt or sweater with the rope inside the trunk of his (HAMMOND) Cadillac, which was parked at the apartment. At approximately 12:10am, the CI entered the CIV and at approximately 12:11am, COLEMAN entered the CIV, followed by HAMMOND. When HAMMOND entered the CIV, he was holding the firearm, the same one he had previously shown the CI, in his left hand. Once HAMMOND sat down in the front passenger seat, he was observed placing the firearm underneath the front passenger seat. The trio then departed the residence in the CIV.

19. At approximately 12:16am, a traffic stop was conducted on the CIV. From the audio/video recording of inside the vehicle, HAMMOND was observed reaching underneath the front passenger seat. The CI pulled the vehicle to the side of the road near the intersection of 6th Street and Rosemont Avenue. An Albuquerque Police Department (APD) Detective who conducted the traffic stop instructed the CI to exit the vehicle, to which he/she complied. The APD Detective then directed HAMMOND to exit the vehicle, which he did. Both the CI and HAMMOND were placed in handcuffs and detained. An ATF SA then removed COLEMAN from the rear passenger seat and placed her handcuffs, temporarily detaining here.

20. An ATF SA conducted a check of the vehicle to ensure there were no additional people inside. The ATF SA observed the muzzle of a firearm protruding from underneath the front passenger seat. The firearm was retrieved and made safe by ejecting the magazine. The firearm was loaded with nine (9) rounds of Hornady, 9mm ammunition from the

magazine.  The firearm is further described as a Glock, model 30, .45 caliber pistol, s/n PBM960.

21.  While processing the CIV, HAMMOND was placed in the backseat of the APD marked vehicle.  HAMMOND stated APD were killers and that he was a "retired one."

22.  Following HAMMOND'S arrest, during the search incident to arrest, a white cell phone was located in one of his pockets, along with a state of New Mexico driver's license, and keys for the Cadillac Deville.  These items were inadvertently given to COLEMAN, who then left the scene.

23. During HAMMOND'S incarceration since June 26th, he has communicated via a jail phone.  The following is a conversation he had with a female, believed to be COLEMAN;

FEMALE: Just got off the phone with ugh Vanessa cause umm I tried to change your number and pay for it to be changed and they said that your phone is not in your name.
HAMMOND: Why you changing the number?
FEMALE: Cause you don't need the same number Adrian. He is the police dude. He's all over Facebook. He is the police you don't need his number. I mean well you could have his number cause he's still answering from that phone.  They don't need to have your number. I don't know if they have your line tapped. I ain't taking no motherfucking risk.
HAMMOND: I feel you
FEMALE: I'm thinking about Mikey and everybody else right now.
FEMALE: I'm just genuinely trying to change your number cause I'm thinking about everybody else who is in your circle who's on your phone.

24.  Based upon my training and experience, and the training and experience of other agents and officers, I know that persons who conduct drug rip-offs are commonly attempting to steal items routinely found at drug traffickers' residences and stash houses, to include narcotics, cash and other types of drug proceeds, and firearms.  The persons who

conducted the drug rip-off then traffic these items in order to profit from their robbery. As such, their residences and vehicles will contains items related to drug rip-offs as well as drug trafficking, to include narcotics, cash, items to package and distribute narcotics, tools and materials used to commit drug rip offs, records of narcotics trafficking in handwritten and electronic forms, proceeds from narcotics trafficking, and records of proceeds from narcotics trafficking in handwritten and electronic forms. They further possess communications devices such as cellular phones to communicate with their fellow drug rip off conspirators and persons involved in their narcotics trafficking, and commonly take photographs and videos on these devices of the items they have acquired/stolen in relation to their illicit activities.

## CONCLUSION

25. Your Affiant also respectfully requests permission to search the residence located at 2428 Rice Avenue NE, apartment A4, Albuquerque, NM. Your Affiant opines that based on observations made by the CI when inside the apartment, corroborated by the audio/video recordings, probable cause exists that HAMMOND's cell phone (using call number 505 389-0531), rope, zip-ties, masks, latex gloves, narcotic related contraband, firearms, and firearms accessories exists within the property described above; in violation of Title 18 U.S.C. §§ 922(g)(1), 924(c) and Title 21 U.S.C § 841(a)(1).

26. Your Affiant also respectfully requests permission to search the vehicle, cream with tan cloth top, 2002 Cadillac Deville, bearing a state of New Mexico license plate number 775RBY located in Albuquerque, NM. Your Affiant opines that based on observations made by the CI when he/she and HAMMOND exited the apartment and the CI observed

HAMMOND placed the black clothing item with the rope inside of the trunk of the

Cadillac Deville, probable cause exists that evidence of instruments utilized for drug rip-

offs, to include but not limited to rope, zip-ties, masks, latex gloves, narcotic related

contraband, firearms, and firearms accessories exists within the property described above;

in violation of Title 18 U.S.C. §§ 922(g)(1), 924(c), and Title 21 U.S.C § 841(a)(1).

Respectfully submitted,

Russell Johnson
Special Agent
ATF

Subscribed and sworn to before me
on June 29, 2016:

HONORABLE Karen Molzen
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The target residence is contained within the physical property located at 2428 Rice Avenue, NW, Apartment A4, Albuquerque, County of Bernalillo, State of New Mexico, 87107. The target residence is located on the second floor of a two story apartment structure, which is brown in color with light tan trim. The numbers "2428" appear in black lettering on the north side of the apartment complex. Specifically, the target apartment has a staircase leading up to the north facing door. The door is a metal screen door, white in color, with the number "4" in black lettering on the wall, on the left side of the door. There is a small parking lot with a sidewalk leading up to the base of the staircase, on the east side of the target residence. The target residence is located on the south side of Rice Avenue and is west of the intersection of Amado Street and Rice Avenue. The target location is recorded as parcel ID number: 101205949625941000, MAP 35, TR 212 with the Bernalillo County Assessor's Office.



**ATTACHMENT B**

a.      Illegal narcotics in various forms.

b.      United States and foreign currency derived from the sale of controlled substances in violation of 21 U.S.C. § 841(a)(1).

c.      Tools used to package, store, and distribute narcotics, including, but not limited to plastic bags, pill bottles, scales, spoons, powders, and other materials used as additives or adulterants in packaging narcotics.

d.      Tools used to commit a robbery/drug rip off and bound victims, to include but not limited to, zip ties, rope, duct tape, masks, gloves and entry tools.

e.      Records including: narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed.

f.      All records relating to the aforementioned violations including lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions; any information related to sources of narcotics (including names, addresses, phone numbers, or any other identifying information); any information recording schedules or travel.  Bank account records, wire transfer records, bank statements, money drafts, checks, letter of credit, credit card bills, safety deposit keys and records, money wrappers, money containers, income tax returns, records of financial transfers which reflect the money generated from illegal trafficking of narcotics.

g.      Cell phones (to include Hammond's cellular phone having call number 505 389-0531), telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to traffic narcotics or conspire with others to traffic or acquire narcotics.

h.      Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including records concerning currency, precious metals, and/or jewelry valued in excess of $1,000, documentation relating to the purchase of real estate or motor vehicles; records evidencing the establishment of shell corporations and/or business fronts; records, documents, or other evidence relating to the existence of wire transfers, cashier's checks, and money orders; and money counting machines.

i.      All firearms, including handguns, pistols, revolvers, rifles, shotguns, silencers, explosives, incendiary devices, or any other weapon or device that shoots a projectile by means of an explosive charge; components of such weapons or devices, including receivers, slides, and barrels.

j.      All ammunition and magazines, or components used to make ammunition, including smokeless powder, black powder, and other explosive components.

k.      Documents relating to the illegal possession and/or use of firearms, including receipts for firearms and ammunition, boxes for firearms and ammunition, and manuals and other documents for firearms and ammunition.

l.      Indicia of residence and/or control over the premises, including bills, correspondence, mail, keys, receipts, and cancelled rent checks and/or money orders.

m.      Photographs, video, and other depictions of illegal firearms possession, and devices on which such photographs, videos, and depictions can be stored in electronic form, including on i-Pods, cellular telephones, personal data accessories, DVDs/compact disks, zip disks, and other electronic media.

n.      Correspondence indicating contact between possible co-conspirators believed to be involved in narcotics trafficking.